NBA PROPERTIES, INC., a New York Corporation, and National Football League Properties, Inc., a California Corporation, Plaintiffs,

v.

DAHLONEGA MINT, INC., a Georgia Corporation d/b/a Chattanooga Coin & Sportscards, Chattanooga Coin Co., Chattanooga Coin, DM Inc., and DM Corp., Lewis Revels, an individual, and Mary Revels, an individual, Defendants.

No. CIV.A. 4:97CV0208HLM.

United States District Court,
N.D. Georgia,
Rome Division.

June 2, 1998.

William Howard Brewster, James A. Trigg, Atlanta, GA, Thomas E. Graham, pro hac vice, Winston–Salem, NC, for NBA Properties, Inc., National Football League Properties, Inc.

Hugh J. Moore, Jr., pro hac vice, Witt Gaither & Whitaker, Chattanooga, TN, Daniel James Warren, Jones & Askew, Atlanta, GA, Christopher A. Townley, Office of Christopher A. Townley, Rossville, GA, for Dahlonega Mint, Inc., Lewis Revels.

Cynthia Dell Hall, Hugh J. Moore, pro hac vice, Witt Gaither & Whitaker, Chattanooga, TN, Christopher A. Townley, Office of Christopher A. Townley, Rossville, GA, for Mary Revels.

## ORDER

HAROLD L. MURPHY, District Judge.

This is a trademark infringement and unfair competition case in which Plaintiffs claim that Defendants sold sports trading

cards that infringe on Plaintiffs' trademarks. The case is before the Court on Plaintiffs' Motion for Summary Judgment [34].

## I. Background

Plaintiff NBA Properties, Inc. ("Plaintiff NBA") is a New York corporation engaged in the business of exploiting the trademarks owned by the teams that constitute the National Basketball Association ("NBA"). (Decl. of Harvey Benjamin ¶ 4.) Plaintiff National Football League Properties, Inc. ("Plaintiff NFL") is a New York corporation engaged in the business of exploiting the trademarks owned by the teams that constitute the National Football League ("NFL"). (Benjamin Decl. ¶¶ 6–7.) Defendant Dahlonega Mint, Inc. ("Defendant Dahlonega") is a Georgia corporation engaged in the business of selling collectible coins and sports memorabilia. (Decl. of Lewis Revels ¶ 3.) Defendant Lewis Revels is the owner and operator of Defendant Dahlonega. (*Id.*) Defendant Mary Revels is the wife of Defendant Lewis Revels. (*Id.*)

From 1993 through 1997, Defendants purchased from manufacturers and then re-sold 120 separate sports card designs that are not licensed by Plaintiffs. (Pls.' Mot. Summ. J. Ex. 3.) Sixty-seven of the unlicensed sports card designs depict professional athletes in their team uniforms, complete with the team names and logos. (*Id.*) A few of the unlicensed sports card designs depict professional athletes in uniforms that are not associated with a specific professional sports team. (*Id.*) The remainder of the unlicensed sports card designs depict professional athletes in their team uniforms, with the team names and logos removed. (*Id.*)

Defendants primarily sold the unlicensed sports card designs to sports card collectors through Defendant Dahlonega's self-published magazine, "The Coin and Sportscard Wholesaler." (Pl.'s Mot. Summ. J. Ex. 13.). On occasion, however, Defendants also sold the unlicensed sports card designs through other publications such as "Sports Collector's Digest." (Dep. of Lewis Revels at 116.) In either case, Defendants routinely advertised the unlicensed sports card designs together with licensed sports card designs. (Benjamin Decl. ¶ 14.)

In 1993, Plaintiff NBA learned that Defendants were selling unlicensed Shaquille O'Neal basketball cards in conjunction with a set of licensed basketball cards through the "Sports Collector's Digest." (Benjamin Decl. ¶ 14; Decl. of Colin Hagen ¶ 7.) Plaintiff NBA notified Defendants that the unlicensed Shaquille O'Neal basketball cards allegedly infringed on Plaintiff NBA's trademarks. (Pls.' Mot. Summ. J. Ex. 15.) Plaintiff NBA demanded that Defendants cease selling the unlicensed Shaquille O'Neal cards and provide the following items to Plaintiff NBA: (1) the name of Defendants' supplier of the unlicensed Shaquille O'Neal cards; (2) the remaining inventory of the unlicensed Shaquille O'Neal cards; and (3) the sales information regarding the unlicensed Shaquille O'Neal cards. (*Id.*) Defendants complied with Plaintiff NBA's requests. (Revels Decl. ¶ 14; Pls.' Mot. Summ. J. Ex. 15 (memo from Defendant Revels to employees instructing employees not to sell unlicensed Shaquille O'Neal cards).)

In late 1996, Plaintiffs learned that Defendants were distributing numerous unlicensed NBA and NFL sports card designs. (Decl. of Wayne Grooms ¶ 5.) Plaintiffs hired a private investigator to determine the extent to which Defendants were selling unlicensed sports card designs. (Grooms Decl. ¶¶ 8, 10–13.) Plaintiffs' investigator induced local law enforcement agencies to search Defendants' property and confiscate approximately 30,-000 unlicensed sports cards. (*Id.*) Based on a review of the confiscated cards, Plaintiffs believe that Defendants possessed 120 separate sports card designs that infringe on Plaintiffs' trademarks. (Compl. ¶ 30.)

On July 2, 1997, Plaintiffs filed this lawsuit. Plaintiffs assert the following causes of action: (1) trademark infringement and unfair competition under sections 32 and

43(a) of the Lanham Act, 15 U.S.C.A. §§ 1114, 1125(a); (2) counterfeiting under section 34(d)(1)(B) of the Lanham Act, 15 U.S.C.A. § 1116(d)(1)(B); (3) federal trademark dilution; (4) state trademark dilution; (5) injury to business reputation under section 43(c) of the Lanham Act, 15 U.S.C.A. § 1125(c), and under O.C.G.A. § 10–1–451(b); (6) trademark infringement and unfair competition under Georgia common law; and (7) deceptive trade practices under the Georgia Uniform Deceptive Trade Practices Act, *codified at* O.C.G.A. § 10–1–370 *et seq.* On February 5, 1998, Plaintiffs filed their Motion for Summary Judgment.

## II. Discussion

### A. Summary Judgment Standard

Federal Rule of Civil Procedure 56(c) authorizes summary judgment when all "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." A district court "can only grant summary judgment 'if *everything* in the record ... demonstrates that no genuine issue of material fact exists.'" *Tippens v. Celotex Corp.,* 805 F.2d 949, 952 (11th Cir.1986) (quoting *Keiser v. Coliseum Properties, Inc.,* 614 F.2d 406, 410 (5th Cir.1980)).

For a long time, it has been established that the party seeking summary judgment bears the burden of demonstrating the absence of a genuine dispute as to any material fact. *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Bingham, Ltd. v. United States,* 724 F.2d 921, 924 (11th Cir.1984). The moving party's burden is discharged by " 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In assessing whether the movant has met this burden, the district court must view the evidence and all factual inferences in the light most favorable to the party opposing the motion. *Reynolds v. Bridgestone/Firestone, Inc.,* 989 F.2d 465, 469 (11th Cir.1993). Once the moving party has supported its motion adequately, the nonmovant has the burden of showing summary judgment is improper by coming forward with specific facts that demonstrate there is a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

When considering motions for summary judgment, the court does not make decisions as to the merits of disputed factual issues. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Ryder Int'l Corp. v. First Am. Nat'l Bank,* 943 F.2d 1521, 1523 (11th Cir.1991). Rather, the court only determines whether there are genuine issues of *material* fact to be tried. Applicable substantive law identifies those facts that are material. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505 ("[I]t is the substantive law's identification of which facts are critical and which facts are irrelevant that governs."). Disputed facts which do not resolve or affect the outcome of a suit will not properly preclude the entry of summary judgment because such facts are not material. *Id.*

In addition to materiality, courts also must consider the genuineness of the alleged dispute. "[S]ummary judgment will not lie if the dispute about a material fact is '*genuine.*'" *Id.* (emphasis added). A dispute is genuine "if the evidence is such that a reasonable jury could not return a verdict for the nonmoving party." *Id.* Moreover, for factual issues to be genuine, they must have a real basis in the record. *Matsushita,* 475 U.S. at 587, 106 S.Ct. 1348. The nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* at 586, 106 S.Ct. 1348. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Id.* at 587, 106 S.Ct. 1348 (quoting *First Nat'l Bank of Arizona v. Cities Serv. Co.,*

391 U.S. 253, 289, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)). "[T]his standard mirrors the standard for a directed verdict." *Anderson,* 477 U.S. at 250, 106 S.Ct. 2505. "[T]he inquiry under each is the same: whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52, 106 S.Ct. 2505.

### B. Plaintiffs' Trademark Infringement Claim

■ Section 32 of the Lanham Act provides a cause of action for trademark infringement for any use of a mark that is "likely to cause confusion, or to cause mistake, or to deceive" consumers regarding the source of a product or service. 15 U.S.C.A. § 1114. In order to prevail in a trademark infringement case, a plaintiff must show that: (1) it holds a mark that is worthy of protection; and (2) the defendant's use of the allegedly infringing mark created a likelihood of confusion among customers regarding the origin of the goods that the defendant sold using the mark. *University of Ga. Athletic Assoc. v. Laite,* 756 F.2d 1535, 1540–43 (11th Cir. 1985) (determining first whether mark was worthy of protection and then determining whether the allegedly infringing mark created a likelihood of confusion).

■ When determining whether a mark is worthy of protection, courts first must classify the mark as generic, descriptive, suggestive, arbitrary, or coined. *Id.* Marks that are generic are worthy of no protection whatsoever. *Freedom Sav. & Loan Assoc. v. Way,* 757 F.2d 1176, 1182 n. 5 (11th Cir.1985). Marks that are descriptive are worthy of protection only if the plaintiff shows that the marks have achieved " 'secondary meaning—[t]he power of a name or other configuration to symbolize a particular business, product or

company .…' " *University of Ga. Athletic Assoc.,* 756 F.2d at 1540 (quoting *Universal City Studios, Inc. v. Nintendo Co.,* 578 F.Supp. 911, 923 (S.D.N.Y.1983)). Marks that are suggestive, arbitrary, or coined, however, are worthy of protection without proof that the marks have achieved secondary meaning. *University of Ga. Athletic Assoc.,* 756 F.2d at 1540.

■ The Eleventh Circuit has identified seven factors to consider when deciding whether a likelihood of confusion exists between a trademark and an allegedly infringing mark: (1) the type of trademark at issue; (2) similarity of design; (3) similarity of services; (4) identity of purchasers and similarity of retail outlets; (5) similarity of advertising campaigns; (6) the defendant's intent; and (7) actual confusion. *Freedom Sav. & Loan Assoc.,* 757 F.2d at 1176, 1182; *Safeway Stores, Inc. v. Safeway Discount Drugs,* 675 F.2d 1160, 1164 (11th Cir.1982); *Roto–Rooter Corp. v. O'Neal,* 513 F.2d 44, 44 (5th Cir.1975);[1] *Continental Motors Corp. v. Continental Aviation Corp.,* 375 F.2d 857, 857 (5th Cir.1967).

Before examining Plaintiffs' claims under the above analysis, the Court must address the theory under which Plaintiffs are proceeding. For the purposes of analysis, the Court separates Plaintiffs' claims into two categories. First, Plaintiffs allege that Defendants sold unlicensed sports card designs that depict professional athletes in their team uniforms, complete with team logos. The parties have stipulated that the sixty-seven card designs falling into this category infringe on Plaintiffs' trademarks. (Defs.' Resp. to Pls.' Mot. for Summ. J. Ex. A. (Parties' Joint Stipulation as to Non–Contested Designs).) Summary judgment on the issue of trademark infringement liability with respect to the sixty-seven card designs listed in the parties' stipulation thus is appropriate.[2]

---

**1.** Opinions of the Fifth Circuit issued prior to October 1, 1981, the date marking the creation of the Eleventh Circuit, are binding precedent on this Court. *See Bonner v. City of*

*Prichard,* 661 F.2d 1206, 1209–11 (11th Cir. 1981) (en banc).

**2.** Specifically, Plaintiffs are entitled to summary judgment with respect to the card de-

Second, Plaintiffs allege that Defendants sold fifty-three sports card designs depicting professional athletes in team uniforms with the team names and logos removed. Plaintiffs argue that the depiction of a professional athlete in a uniform that resembles a professional sports team uniform, but that does not depict a professional sports team name or logo, nevertheless infringes on Plaintiffs' marks.[3] When considering this claim, the Court's analysis thus focuses on whether a reasonable factfinder *must* conclude that Defendants' use of the team uniform designs with the team names and logos removed creates a likelihood that consumers would believe that Plaintiffs licensed these sports cards.[4]

### a. Whether Plaintiffs' Uniform Designs with the Team Names and Logos Are Worthy of Protection

■■■■ Plaintiffs registered the marks underlying their claims with the United States Patent and Trademark Office ("USPTO"). Once a mark has been registered, proof of registration is prima facie evidence of the registrant's right to use the mark, but it does not preclude one who is sued for trademark infringement from proving "any legal or equitable defense or defect which might have been asserted if such mark had not been registered." 15 U.S.C.A. § 1115(a); *Soweco, Inc. v. Shell Oil Co.*, 617 F.2d 1178, 1184 (5th Cir.1980). If, however, a registrant has used his mark in connection with the goods or services specified on his registration for five continuous years after the registration date, his mark is deemed "incontestable," 15 U.S.C.A. § 1065, and his registration constitutes "conclusive evidence" of his right to use the mark, subject only to the seven defenses enumerated in 15 U.S.C.A. § 1115(b). An "incontestable" mark cannot be challenged as lacking secondary meaning; such marks are conclusively presumed to be nondescriptive or to have acquired secondary meaning. *Soweco*, 617 F.2d at 1184; *Union Carbide Corp. v. Ever–Ready, Inc.*, 531 F.2d 366, 377 (7th Cir.1976). Here, the record conclusively shows that Plaintiffs have registered their

---

signs depicted in Exhibit 3 to Plaintiffs' Motion for Summary Judgment and numbered: 3–A–1 through 3–A–5, 3–A–7, 3–A–10, 3–A–12, 3–A–24, 3–A–25, 3–A–28, 3–A–33, 3–A–34, 3–A–38 through 3–A–48, 3–A–50, 3–A–64, 3–A–66, 3–A–74 through 3–A–81, 3–B–3 through 3–B–14, 3–B–16, 3–B–19 through 3–B–26, 3–B–28 through 3–B–34, and 3–B–37 through 3–B–39.

3. To the extent that Plaintiffs argue that the team uniform designs with the team names and logos removed are separate and distinct trademarks, the Court rejects this argument. Trademark rights are appropriated only through actual prior use in commerce. *Bauer Lamp Co. v. Shaffer*, 941 F.2d 1165, 1171 (11th Cir.1991) ("Trademark protection accrues with use, while copyright protection begins with registration."); *Tally-Ho, Inc. v. Coast Community College Dist.*, 889 F.2d 1018, 1022–23 (11th Cir.1989); *see also United States v. Steffens*, 100 U.S. 82, 10 Otto 82, 25 L.Ed. 550 (1879) (opining that trademark protection requires commercial use); J. McCarthy, Trademarks and Unfair Competition § 16:1, at 720 (2d ed.1984). Trademark ownership always is appurtenant to commercial activity. *Tally–Ho*, 889 F.2d at 1023. Thus, actual and continuous use is required to

acquire and retain a protectable interest in a mark. *Id.* Because Plaintiffs have proffered no evidence that they used the team uniform designs with the team names and logos removed, the Court concludes that the team uniform designs with the team names and logos removed are not separate and distinct trademarks.

4. Defendants interpret Plaintiffs' brief as arguing that the professional sports uniforms without the logos are protectable trade dress. Defendants thus focus their arguments in their reply brief on a claim of trade dress infringement. The term "trade dress" refers to "the total image of a product and may include features such as size, shape, color or color combinations, texture, graphics, or even particular sales techniques." *AmBrit, Inc. v. Kraft, Inc.*, 812 F.2d 1531, 1535 (11th Cir. 1986). To the extent that Plaintiffs do intend such an argument, the Court rejects it because Plaintiffs' have not established the necessary elements of a trade dress claim, including a showing that: (1) Plaintiffs' trade dress is inherently distinctive or has acquired secondary meaning; (2) Plaintiffs' trade dress in non-functional; and (3) Defendants' trade dress is confusingly similar. *Bauer Lamp Co. v. Shaffer*, 941 F.2d at 1170..

marks *and used them* for five continuous years after the registration date.[5] Consequently, the Court concludes as a matter of law that Plaintiffs' marks are worthy of protection.

### b. Whether Defendants' Use of Similar Marks Created a Likelihood of Confusion

In deciding whether Defendants' use of the team uniform designs with the team names and logos removed created a likelihood of confusion, the Court considers the following seven factors: (1) the type of trademark at issue; (2) similarity of design; (3) similarity of services; (4) identity of purchasers and similarity of retail outlets; (5) similarity of advertising campaigns; (6) the defendant's intent; and (7) actual confusion. *Freedom Sav. & Loan Assoc.*, 757 F.2d at 1182; *Safeway Stores*, 675 F.2d at 1164. After considering each factor, the Court then will determine whether a reasonable factfinder must conclude that a likelihood of confusion exists.

### 1. Type of Mark

Courts protect trademarks to varying degrees, according to the category into which the trademarks fall. *University of Ga. Athletic Assoc.*, 756 F.2d at 1540. Trademarks falling into the generic category receive no protection whatsoever. *Freedom Sav. & Loan Assoc.*, 757 F.2d at 1182 n. 5. Trademarks falling into the descriptive category are protected only if they have acquired a secondary meaning, so that customers associate a particular manufacturer with the descriptive mark at issue. *See University of Ga. Athletic Assoc.*, 756 F.2d at 1540 ("We therefore hold that ... proof of secondary meaning is required in an action under section 43(a) *only* when protection is sought for a descriptive mark, as opposed to an arbitrary or suggestive mark."). Trademarks falling

into the suggestive, arbitrary, or coined categories are protected even without proof that they have acquired secondary meaning. *Id.*

When classifying Plaintiffs' marks, the Court examines the mark's relationship to the services provided by Plaintiffs, not the product being sold by Defendants. *See Id.* at 1541 (examining bulldog trademark's relationship to the plaintiff's sports teams, rather than examining the mark's relationship to the beer sold by the defendant). The Court thus examines whether Plaintiffs' marks are suggestive, arbitrary, or coined with respect to NBA and NFL teams.

A suggestive mark subtly connotes something about the service that it represents. *Id.* An arbitrary or coined mark is completely fanciful, bearing no relationship to the service that it represents. *Id.* Here, the marks consist of uniforms with team names and logos, which are designed to generate recognition and enthusiasm among sports fans. The relationship between the marks and the services provided by Plaintiffs thus is primarily suggestive. For instance, the team name "Orlando Magic" is suggestive with respect to the basketball team that the name represents because the name subtly suggests that the team is composed of players with magical basketball talents.

Under these circumstances, the evidence compels a finding that Plaintiffs' marks are either suggestive, arbitrary, or coined with respect to the sports teams that the marks represent. Plaintiffs' marks therefore are strong and protectable even without a showing that the marks have acquired secondary meaning. This factor thus weighs in favor of a finding of confusion.

---

**5.** The Court notes that Plaintiffs have registered their team uniform designs with the team names and logos removed as trademarks. (Pls.' Mot. Summ. J. Ex. 1, 2.) As previously mentioned, however, the Court rejects the contention that these uniform designs constitute separate and distinct trademarks, because Plaintiffs have proffered no evidence to show that they used the team uniform designs with the team names and logos removed.

## 2. Similarity of Design

In examining the similarity of the two marks, the Court compares the overall design of Plaintiffs' marks with the overall design of Defendants' marks and inquires whether any significant differences exist between the two. *Freedom Sav. & Loan Assoc.*, 757 F.2d at 1183. Defendants' designs are identical to Plaintiffs' designs except that Defendants have removed the team names and logos. Additionally, when Plaintiffs use their marks on sports cards, they include a special logo, stating that the cards are officially licensed by Plaintiffs. Defendants did not include the special logo on their unlicensed card designs. The Court believes that a reasonable factfinder could conclude that the strength of Plaintiffs' marks lies in the team names and logos, and that removing the team names and logos and omitting the officially licensed logo from the sports card designs constitutes a legally significant alteration. *Id.* This factor thus weighs against a finding of confusion.

## 3. Similarity of Services

Plaintiffs license the use of their marks to sports card manufacturers. Plaintiffs thus employ their marks in a manner that is similar, if not identical, to the manner in which Defendants utilized their marks. This factor thus weighs in favor of a finding of confusion.

## 4. Identity of Purchasers and Similarity of Retail Outlets

Defendants sell their sports cards primarily to collectors through specialized publications such as the Sports Collectors Digest. Defendants sell officially licensed cards through the same outlets as they sell the unlicensed cards at issue. Although neither party has submitted evidence regarding the identity of the purchasers, the Court believes that a reasonable factfinder might conclude that sports card collectors who purchase sports cards are sophisticated consumers and can differentiate be-

tween officially licensed cards and unlicensed cards. Indeed, a consumer easily can see the difference between a licensed card in which Plaintiffs' team names and logos are visible and an unlicensed card in which Plaintiffs' team names and logos have been removed. (Defs.' Mot. Summ. J. Ex. B (copy of Defendants' advertisement in which Defendants sell licensed cards next to unlicensed cards).) This factor thus weighs against a finding of confusion.

## 5. Similarity of Advertising Campaigns

Defendants advertised their unlicensed sports cards in the same publications as officially licensed sports cards. This factor thus weighs in favor of a finding of confusion.

## 6. Defendants' Intent

Plaintiffs have adduced no evidence that would compel a reasonable factfinder to conclude that Defendants intentionally infringed on Plaintiffs' marks.[6] Plaintiffs argue that they sent many letters to Defendants informing them that Defendants were infringing on Plaintiffs' marks. These letters, however, merely show that Defendants knew of Plaintiffs' belief that Defendants' use of team uniforms with the team names and logos removed infringed on Plaintiffs' marks. A reasonable factfinder could conclude, however, that Defendants believed that Plaintiffs were mistaken and that the use of the marks at issue did not constitute infringement. This factor thus weighs against a finding of confusion.

## 7. Actual Confusion

Plaintiffs have proffered no evidence that consumers actually were confused by Defendants' use of the marks at issue. The Court therefore cannot conclude as a matter of law that actual confusion existed.

---

**6.** The record conclusively demonstrates that Defendants intentionally infringed on Plaintiffs' marks with respect to the sixty-seven card designs that depict team names and logos. Defendants have stipulated liability with respect to those designs.

### 8. Summary

Considered together, the factors set forth above would permit a reasonable factfinder to find that Defendants' use of the marks at issue did not create a sufficient likelihood of confusion. In so concluding, the Court places significant emphasis on the second factor. When a consumer compares Plaintiffs' officially licensed card designs, in which the team names and logos are prominently displayed, to Defendants' unlicensed card designs, in which the team names and logos have been conspicuously removed, the consumer might believe that the missing team names and logos suggest that Plaintiffs did not license Defendants' card designs. Consequently, a factfinder might reasonably conclude that the consumer would not be confused as to whether Plaintiffs licensed Defendants' card designs. Plaintiffs therefore are not entitled to summary judgment with respect to their claims that Defendants' cards depicting team uniform designs without the team names and logos infringed on Plaintiffs' trademarks.

### C. Plaintiffs' Counterfeiting Claims

 Plaintiffs also have moved for summary judgment with respect to their counterfeiting claim. In order to prevail on their counterfeiting claim, Plaintiffs must demonstrate that Defendants infringed on a registered trademark in violation of 15 U.S.C.A. § 1114(1)(a), and that Defendants "intentionally used a mark, knowing such mark is a counterfeit mark." 15 U.S.C.A. § 1117(b); *Babbit Elec., Inc. v. Dynascan Corp.*, 38 F.3d 1161, 1181 (11th Cir.1994). Plaintiffs have satisfied this burden and thus are entitled to summary judgment with respect to the sixty-seven card designs to which Defendants have stipulated liability. Because a question of fact exists whether Defendants intentionally infringed on Plaintiffs' marks with respect to the fifty-three card designs in which the team names and logos are removed, however, Plaintiffs are not entitled to summary judgment on their counterfeiting claims with respect to these card designs.

### D. Plaintiffs' Remaining Claims

Plaintiffs also have moved for summary judgment with respect to Plaintiffs' remaining claims under federal and Georgia law. Plaintiffs' remaining claims are contingent upon a finding that Defendants infringed on Plaintiffs' marks. *University of Ga. Athletic Assoc.*, 756 F.2d at 1539 n. 11. Plaintiffs are entitled to summary judgment on their remaining claims with respect to the sixty-seven card designs for which Defendants have stipulated liability. Because an issue of fact exists whether Defendants infringed on Plaintiffs' trademarks with respect to the card designs in which team names and logos were removed, Plaintiffs are not entitled to summary judgment with respect to these card designs.

### III. Conclusion

ACCORDINGLY, the Court **GRANTS IN PART AND DENIES IN PART** Plaintiffs' Motion for Summary Judgment [34]. The Court **GRANTS** Plaintiffs' Motion on the issue of liability with respect to the sixty-seven sports card designs to which Defendants have stipulated liability. The Court **DENIES** Plaintiffs' Motion with respect to the remaining fifty-three sports card designs.

The Court also **MODIFIES** its Order of April 29, 1998, and **ORDERS** the parties to submit their proposed Consolidated Pretrial Order within eleven days of the date of this Order. The case will be placed on the next available trial calendar. All motions in limine are due at least seven days before the trial date.

The case will be placed on the next available trial calendar. All motions in limine are due at least seven days before the trial date.